HARRY WILLIAMS v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—98 S. W. (2d) 651.

Division One, November 12, 1936.*

*T. M. Pierce, J. L. Howell* and *Walter. N. Davis* for appellant.

---

*NOTE: Opinion filed at September Term, 1935, March 10, 1936; motion for rehearing filed; motion overruled October 8, 1936; motion to transfer to Court en Banc filed; motion overruled at September Term, 1936, November 12, 1936.

*N. Murry Edwards* for respondent.

596

HYDE, C.—This is an action, under the Federal Employers' Liability Act (U. S. C. A. 51-59), for damages for personal injuries. Plaintiff was injured while working as a section hand on defendant's interstate track and the applicability of the Federal Act is conceded. Plaintiff obtained a verdict for $15,000 and, from the judgment entered thereon, defendant has appealed. Defendant contends that its demurrer to the evidence, at the close of the case, should have been sustained.

Plaintiff was working with a section crew, engaged in cutting a four-foot piece from a steel rail eight or nine feet long. To do this, some of the men steadied the rail at each end with claw bars, the assistant foreman held a chisel against the rail, and another man struck it with a sledge hammer. While plaintiff was helping to steady the rail, a piece of steel flew into his eye when one of the men struck the chisel. We note that the petition charged that defendant negligently furnished a chisel and sledge hammer for this work, which were defective, dangerous and not reasonably safe, and ordered plaintiff to do the work with these defective tools in use, which it was alleged were brittle and liable to chip and cause pieces to fly into the air. It is not necessary to consider these grounds of negligence in ruling on the question of the demurrer to the evidence because plaintiff had no evidence whatever to prove them. There is no evidence about the condition of the sledge hammer. As to the chisel, plaintiff had nothing more than evidence tending to show that the sliver which struck him came from it. Plaintiff made no attempt to show the existence of a defect in the chisel which would have been discoverable by reasonable care in inspection. [See Forbis v. Hessing, 328 Mo. 699, 41 S. W. (2d) 378; Gray v. Doe Run Lead Co., 331 Mo. 481, 53 S. W. (2d) 877.] Defendant's evidence was that the chisel was a new one which had only been used a few times and it had in court the chisel it claimed was used on that occasion, which showed no chipping. Defendant also had evidence that the chisels which it used for-cutting rails were made by an established manufacturer; that they had used the same type and same make about five years; that they had discarded all other types formerly used because this type was "made out of softer material and doesn't mushroom and doesn't

fly'' and ''would cut more rails with less breakage;'' and that it was the best type they had found for cutting rails. Plaintiff did not offer any instructions submitting these grounds of negligence to the jury. Plaintiff also alleged, but did not offer to submit, the failure to furnish goggles as a charge of negligence. The court withdrew this as a ground of recovery, by giving a withdrawal instruction offered by defendant, and it is clear that plaintiff had no evidence which would support a submission on that round. [Schaum v. Southwestern Bell Tel. Co., 336 Mo. 228, 78 S. W. (2d) 439.]

The further grounds of negligence alleged, which plaintiff did undertake to submit to the jury, were the following:

''That defendant and its said servant negligently struck said chisel with said sledge hammer, as aforesaid, and negligently caused, suffered or permitted said piece of steel or metal, as aforesaid, to fly and strike the plaintiff in the face and the eye while he was holding and steadying said rail, as aforesaid; that the defendant negligently failed and neglected to furnish and provide plaintiff with a reasonably safe place within which to do the work required of him to be done; that the defendant negligently did said work in an unsafe and dangerous method.''

Plaintiff had been working for defendant as a section hand about ten months prior to his injury. He had worked as a track laborer for defendant during 1917. He had occasionally worked for defendant at other times after that and had once been an assistant foreman for about ten days. He had also worked for the Wabash for a short time on track work. He had at other times during his service helped to cut rails. He said: ''Maybe once a month or once every three or four months, whenever one broke, we had to put one in, in place of it.'' On the morning he was injured, he began work about seven-thirty. The gang was in charge of Foreman Mersmann and Assistant Foreman Faust. They got tools from a tool house near the crossing of the Wabash and the Terminal. They commenced the work of cutting rails into proper lengths to replace old rails and they first cut two 32-foot rails. A four-foot rail was required to replace an old rail between the rails of the Wabash track at the crossing. They had been at work about an hour when they commenced to cut this four-foot piece from the eight or nine foot rail. To cut this piece, one end of the rail was placed on a wood block, about ten or twelve inches high, and the other end was laid over the rail of a side track so that neither end touched the ground. Plaintiff said: ''We were all there getting ready to cut the rail, and some of them had their foot on the rail, and Mr. Faust said to me, 'Take that bar and steady that rail.' . . . He was standing somewhere near the center by the piece of rail we were to cut.'' Plaintiff took a claw bar, put it under the rail north of where they were cutting at a place near where the assistant foreman pointed. He said that

he could not have stood any farther away from where they were to cut than he did, to steady the rail. He said: "I put the bar under the rail and was getting ready to straighten up in position when all at once I heard a lick hit and something struck my eye. . . . I put the end of it (claw bar) under the rail, in order to raise it, to steady the rail, to keep the bar against it, to steady the rail. . . . I was about a foot away from the north end of the rail. . . . A distance of about three feet. (From where they were making the cut in the rail.) . . . My face was about five feet away from where they had marked to cut the rail. . . . I never did see nobody ready to strike." He said that he did not know that anyone was going to strike the chisel at the time he was injured. About five of the men were steadying the rail. One was holding it at the end with his hands. The others used bars. The foreman was standing nearby watching the work. Plaintiff said that when he was injured the foreman told him " 'a piece of this chisel hit you in the eye,' and he held the chisel up for me to look at." Plaintiff said that no one ever told him to turn away when rails were being cut; that he never knew of chips to fly up before; that he never heard of them flying; and that he never saw anything fly.

██ Even one of plaintiff's witnesses said that the men were warned time after time not to look toward the chisel when rails were cut. Plaintiff called two of the men and the defendant several others. These other members of the gang, in which plaintiff was working, said they had seen chips fly before; that they knew of men being struck by them (but not in the eye); and that they would fly more often from the rail than from the chisel. The chisel had a wooden handle. The method of doing the work was for the assistant foreman to put the edge of the chisel against the rail and hold it in place while it was struck. As soon as he had had it properly placed and the man who placed it was out of the way, the man who was using the sledge hammer would strike the chisel, without any order or signal. The evidence of most of the men tended to show that several blows had been struck and that the rail was nearly cut through before plaintiff was injured. Defendant's evidence was that one man had been striking the chisel to cut through the sides of the rail; that it had been turned over with the ball underneath to cut the flange; that another man had begun to use the sledge hammer; and that it was after he struck the chisel that plaintiff was injured. Plaintiff's evidence, however, tended to show that the sliver which injured him flew up when the first blow was struck. Plaintiff also had evidence tending to show that when short pieces were cut from rails they were usually cut with a hacksaw. Plaintiff said that this was the method usually used when pieces less than six feet in length were cut off. According to defendant's evidence, a saw was used to cut pieces only a few inches long. The court in submitting the

case gave defendant's withdrawal instruction, which withdrew from the jury's consideration as a ground of recovery failure to saw the rail rather than to cut it with the chisel. We hold this action was correct both because the petition was not framed on the theory that it was negligence to use a chisel and because the evidence did not show that cutting rails with a chisel was a negligent method. This leaves to be considered whether there was evidence to show negligence with respect to the safety of the place of work or the safety of the method of doing the work, and the application of the rule of assumption of risk set up in defendant's answer.

Since this is an action under the Federal Employers' Liability Act, which makes assumption of risk a defense (U. S. C. A., sec. 54), we must follow the decisions of the Federal courts in determining the application of this doctrine. [C. & O. Ry. Co. v. Kuhn, 284 U. S. 44, 52 Sup. Ct. 45, 76 L. Ed. 157; Webber v. Terminal Railroad Co., 335 Mo. 11, 70 S. W. (2d) 863, and cases cited.] In the Kuhn case the charges of negligence were: "Ordering him to use a defective sledge hammer and chisel; failing to promulgate and enforce proper rules concerning the upkeep of tools ordinarily used, to furnish guards or goggles for workmen's eyes, to provide a reasonably safe place for him to work." The court said:

"William Kuhn, an experienced section hand fifty-four years old, was engaged with others in repairing a side track leading from petitioner's main line to a steam shovel. It became necessary to remove two steel rails and shorten them some six or eight inches. They were first laid on the ground and then cut with a cold chisel. One man held the chisel while respondent and two others, acting in turn, struck it with a heavy hammer. None of them wore goggles; none asked for goggles *or objected to the method of operation.* The first rail had been severed; work had begun on the second. While respondent was standing by awaiting his turn to strike, a steel chip from the chisel or rail struck and destroyed his eye. On other occasions he had assisted in cutting steel rails when goggles were used, and he knew chips would fly during such an operation. 'That was the value of goggles,' he testified. He understood the dangers incident to the undertaking. The job was a hurry-up one. The assistant foreman in charge had told the men 'to gang up and go in a hurry, that he wanted to get through there.' 'Don't be afraid.'

"We think the evidence clearly discloses that Kuhn's injury resulted from the ordinary hazards of his employment, which he fully understood, and voluntarily assumed. There was no complaint, no promise by his superior to mitigate the obvious dangers. The trial judge should have directed a verdict for the railway company."

Indeed, under the Federal rule of assumption of risk, it was held that an employee even assumed the risk of using a defective

tool (a worn claw bar) where the defect "was so obvious that the most cursory and superficial inspection would have disclosed it," although it was shown "that to discover the defect required an inspection of the underside of the tool, and that, in obeying the order of the foreman, he did not pause to make such inspection, but used the tool without any but casual inspection of its top surface, which did not reveal the defect." [Pryor v. Williams, 254 U. S. 43, 41 Sup. Ct. 36, 65 L. Ed. 120, reversing Williams v. Pryor, 272 Mo. 613, 200 S. W. 53.] Many other cases have made a similar application to that made in the Kuhn and Williams cases of the rule of assumption of risk in cases of eye injuries caused by flying objects, sustained by section men working with simple tools at usual tasks of track repair work. [Harper v. C., R. I. & P. Ry. Co. (Kan.), 28 Pac. (2d) 972; Jones v. Southern Ry. Co. (Ky.), 194 S. W. 558; York v. Rockcastle River Ry. Co. (Ky.), 284 S. W. 79; L. & N. Railroad Co. v. Russell (Miss.), 144 So. 478; Texas & P. Ry. Co. v. Perkins (Tex.), 48 S. W. (2d) 249; Guitron v. Oregon Short Line Railroad Co. (Utah), 217 Pac. 971; McGraw v. N. Y. C. Railroad Co. (W. Va.), 161 S. E. 9; Karras v. C. & N. W. Ry. Co. (Wis.), 162 N. W. 923.] Every contention made by plaintiff herein has been made and ruled on in one or more of these cases, and most of them go further in the application of the Federal rule of assumption of risk than it is necessary to go in this case. [See also 2 Roberts' Federal Liability of Carriers, chap. 39.]

It is true that plaintiff said he had never seen or heard of anything flying from cutting rails with a chisel. However, he was not a new man on the job. He had done track repair work at intervals over a period of about fifteen years. He had been steadily employed on this occasion for almost ten months. He must be considered to have known what any man in the possession of his faculties must have observed and learned about natural results and conditions while working with such tools in such work. [Northwestern Pacific Railroad Co. v. Bobo, 290 U. S. 499, 54 Sup. Ct. 263, 78 L. Ed. 462; see also cases cited in preceding paragraph.] Everyone must know that when steel strikes steel, with great force, it is possible for small slivers to break off and fly from the place of impact. Especially where a solid rail is being cut away with a chisel, surely experienced men would expect some pieces to fly occasionally. Of course, this is not to be expected and does not happen with every blow. When such a piece does fly, the chance that it will strike anyone in the eye is remote. For that reason most men in such work do not care to be put to the inconvenience of wearing goggles, as they do when working with machines which continually send out sparks or slivers. It seems that there was no real danger of injury from such slivers in this work except when looking toward the chisel at the time it was struck,

and that it was not necessary to do that. The men who worked with him in this gang, offered as witnesses by plaintiff, said that they knew that slivers would sometimes fly and knew not to look toward the chisel when it was about to be struck. There is no apparent reason why plaintiff should not have observed and learned what the other men knew. The rule of the United States Supreme Court is that "a workman of mature years is taken to assume risks of this sort (such dangers as are normally and necessarily incident to the occupation), whether he is actually aware of them or not." [Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062.] One recognized exception is found in the cases, to the application of this rule, namely: Risks not glaringly dangerous are not, as a matter of law, held to be assumed when work is continued for a reasonable time after complaint under a promise to remedy a defect or to make a place or condition safe. [See Swaim v. C., R. I. & P. Ry. Co. (Iowa), 174 N. W. 384, certiorari denied 40 Sup. Ct. 344, 252 U. S. 577, 64 L. Ed. 725; 2 Roberts' Federal Liability of Carriers, 1617, sec. 832.] There is nothing of that nature in this case. We must, therefore, in view of the Federal rule, hold that the risk of being struck by such a sliver was one of the ordinary risks incidental to the work which plaintiff was employed to do, which under the Federal rule he assumed, and against which he was required to protect himself.

Under our Missouri rule, assumption of risk is not a defense at all where the risk arises from the employer's negligence, but the employee's conduct with reference to such risks is considered only as to whether or not it is contributory negligence. "Therefore, the defense of assumption of risk, under our rule, really is the same as a denial of any negligence, and this court has held that 'a special plea that plaintiff assumed such a risk is unnecessary,' because 'if the plaintiff's suffering was solely from a risk incident to the business, he cannot recover, because it was a risk he assumed when he undertook the service; and this fact the defendant may show under his plea of general denial, because by so showing he disproves the allegation of negligence on his part.' [Curtis v. McNair, 173 Mo. 270, l. c. 281, 73 S. W. 167, 169.]" [Schaum v. Southwestern Bell Telephone Co., 336 Mo. 228, l. c. 239, 78 S. W. (2d) 439.] Even if we consider the matter solely under our own rules of negligence, where can we find any negligence shown by the evidence in this case? Negligence cannot be based merely upon what is possible to occur. "Negligence which imposes liability must result from a faulty or defective foresight. Negligence is predicated on what should have been anticipated, rather than what happened." [McCollum v. Winnwood Amusement Co., 332 Mo. 779, 59 S. W. (2d) 693.]

In this case, there is no evidence to show that there was anything wrong with plaintiff's place of work. If there was any negligence

it could only have been in the method of doing the work and not in the place where it was done. The place of work and the method of work may be closely related matters. Sometimes it is stated that the place of work is made unsafe by the method of doing the work. Cases where that could be properly said to be true usually involve situations in which the instrumentalities used are very dangerous or complicated or where the uses made of them by different groups of workmen make it unreasonable to expect individual workmen to protect themselves from the results of their use. In such cases "a safe method of doing the work is something that the employer can provide to safeguard his employees from some risks of the shifting and changing of physical surroundings of the place of work, and the use of the required instrumentalities therein; and when it is necessary for their protection, in the exercise of reasonable care, it should be held to be a part of his duty to them and his failure to perform it is negligence. In other words, the employer's duty is not merely safety of the place of work of his employee, but also his *safety in his place of work;* in short, a safe environment as well as a safe place. This duty is performed by providing a safe method of work, and it properly arises from circumstances where an employee cannot safely look out for himself because of the complexity of the operations under way." [Kelso v. Ross Construction Co., 337 Mo. 202, 85 S. W. (2d) 527.]

In this case, the "operations under way" were not complex, the instrumentalities in use were not dangerous or complicated, and apparently the work was being carried on by the ordinary and usual method of conducting such work. Nor is it claimed that the chisel was struck in any unusual or extraordinary manner. Plaintiff's theory is that it was negligence for the assistant foreman to put the chisel in place to be struck, for the foreman to allow it to be struck, or for any man to strike it, without seeing that plaintiff was turned away so that if a sliver flew it could not have injured his eye. Obviously, such a method would materially slow up work. Is such work ordinarily done by reasonably careful workmen in that manner? Would this not set up higher standards than reasonable care and require a duty of absolute safety of method of work rather than reasonable safety? It is the failure to use a reasonably safe method of doing the work which amounts to negligence and an employer is liable only for negligence. We find no evidence from which it can be said that, when cutting a rail with a chisel, it is a negligent method of doing that work, with a gang of experienced track workers, to have one man pay attention only to keeping the chisel placed on the mark where it is to be cut, to have the man striking the chisel watch only the man who is placing the chisel and where he is to strike, and, if the other men holding the rail steady with bars are placed far

enough away so that they will not be struck by the hammer, to expect them to look out for their own safety from such slivers as may sometimes fly. Does a reasonably safe method require that an order to turn away be given before every blow is struck? There is no evidence that defendant or any other railroad employed the method of work that plaintiff's contentions would require or that they employed any different method than that shown here. Surely it is not so inherently dangerous that it can be said to be negligent without such evidence. "The duty to furnish suitable instrumentalities does not require the employer to furnish the best, newest, and safest appliances, but only to use due care to provide those which are reasonably free from danger. Likewise, the duty to provide safe methods of doing the work in which employees are engaged does not require the best methods or protective devices which might be devised, but only reasonably safe methods. . . . 'In regard to the style of the implement or nature of the mode of performance of any work, "reasonably safe" means safe according to the usages and habits and ordinary risks of the business. Absolute safety is unattainable, and employers are not insurers. They are liable for consequences not of danger, but of negligence, and the unbending test of negligence in methods, machinery, and appliances, is the ordinary usage of the business." [Schaum v. Southwestern Bell Telephone Co., supra.]

Therefore, if considered under the Federal rule, plaintiff must be held as a matter of law to have assumed the risk of injury from this cause as one of the ordinary risks incidental to his work, and also, in this situation applying our own rules of negligence, we must find that defendant was not shown to be guilty of any negligence. Although plaintiff's injuries resulted from an unfortunate accident and not from negligence, nevertheless if he had been an employee within the jurisdiction of our Workmen's Compensation Act, he would have been able to receive compensation. The modern tendency is to place industrial workmen on an insurance basis by such laws. Such cases as this show that the rules of common-law negligence were wisely deemed inadequate by our Legislature for meeting the situation created by modern industrial accidents, under which there were too many employees who had to be left to bear the entire burden of injuries, which were not caused by the negligence of their employer. However, the Federal law is exclusive in the field of interstate railroad transportation and we must decide this case by its rules, and under it liability does depend upon proof of negligence.

The judgment is reversed. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.